Gary Wayne Clements ("the father") and Eugenia Ann Clements ("the mother") were divorced by a November 12, 2002, judgment of the trial court. One child was born of the parties' marriage; he was five years old at the time of the hearing in this matter. Pursuant to a settlement agreement incorporated into the divorce judgment, the parties shared joint legal custody of the child with the mother having primary physical custody. A copy of the divorce judgment is not contained in the record on appeal.
By a letter dated October 25, 2003, the mother notified the father, pursuant to § 30-3-165, Ala. Code 1975, a part of the Alabama Parent-Child Relationship Protection Act, § 30-3-160, et seq., Ala. Code 1975 ("the Act"), that she intended to move with the child to New York. On November 19, 2003, the father filed a petition, pursuant *Page 954 
to the Act, seeking a modification of custody and objecting to the child being relocated to New York. The father also sought a restraining order prohibiting the mother from removing the child from the jurisdiction of the trial court pending the entry of a final order from the trial court. The trial court granted the father's motion and entered a restraining order. On December 9, 2003, the mother answered and counterclaimed, seeking, among other things, sole custody of the child.
The trial court held a final hearing on March 11 and 12, 2004, at which it received documentary evidence and heard extensive ore tenus evidence. On April 13, 2004, the trial court entered a final judgment in which it denied both the father's and the mother's petitions for a modification and permitted the mother to relocate with the child to the state of New York. In its judgment, the trial court specifically found that "the [father] failed to meet his burden of proof for a modification of custody of the parties' minor child." The trial court also modified the father's visitation and ordered the parties each to pay a portion of the traveling expenses associated with visitation. The father timely appealed.
The evidence presented at trial revealed the following pertinent facts. The father is 48 years old and lives in Prattville. The father has been married five times but testified that, at the time of trial, he was not involved in a relationship. The father is self-employed; he rents five booths at a Prattville flea market and maintains another booth at a flea market in Millbrook. Copies of income-tax returns admitted into evidence at trial reveal that the father claimed $15,140 in income in 2001 and $11,999 in income in 2002. According to the father, the flea-market sales are his sole source of income. The father testified that he has no health insurance or disability insurance.
The father has no immediate family that lives in Alabama. According to the father, his brother, his sister, and his mother all reside in Tennessee. The father has one child, a daughter, from a previous marriage; that child lives in Texas. The father testified that he has two grandchildren but that he had not visited with the grandchildren within the last two years.
The child was five years old at the time of the hearing in this matter. The record indicates that the father regularly exercised his visitation with the child and that he was current on his child support. The father testified that when he exercises visitation with the child, the child typically goes to work with him at the flea market. According to the father, the child learns a work ethic by going to the flea market. The father testified that he provides a "structured environment" for the child.
The father testified that it is in the child's best interests to continue to live in Prattville. The father testified that the child's family and friends live in Alabama. The father expressed concern that he would have "no relationship" with the child if the child moved to New York. The father testified that he worried that the mother would not promote a relationship between the child and him. According to the father, the costs associated with traveling to New York would prohibit him from exercising visitation as often as he would like. The father opined that he could better provide stability for the child than could the mother. The father denied the allegation that he sought a modification of custody based solely on the mother's desire to relocate to New York.
The mother is 40 years old and has a college degree. Before giving birth to the child, the mother maintained full-time employment. According to the mother, she worked part-time, on occasion, after the child was born. The mother testified that *Page 955 
she chose to stay at home with the child after the parties divorced.
After the parties divorced, the mother moved to Millbrook to live with the child's maternal grandparents. The mother continued to live in the home of the maternal grandparents after the father filed his November 19, 2003, modification petition. The mother testified that the maternal grandparents provided financial support so that she could stay at home with the child.
On November 22, 2003, the mother married Dr. Eric Teitel, a resident of Somers, New York; it was the third marriage for both. The mother met Dr. Teitel through the Web site eHarmony.com, an Internet dating service. In September 2002, she began a relationship with Dr. Teitel. The mother testified that she regularly flew to New York to visit Dr. Teitel before she married him but that she only traveled to New York when the father had custody of the child during his scheduled visitation. According to the mother, she did not move to New York after she married Dr. Teitel because she did not want to move to New York without the child.
The record indicates that Dr. Teitel first met the child in September 2002 during a trip to Alabama for his first date with the mother. In May 2003 the mother and the child went to Disney World amusement park with Dr. Teitel, Dr. Teitel's sister, and the sister's family. In August 2003, the mother, the child, Dr. Teitel, and the maternal grandparents vacationed in New York. In addition to trips with the child, Dr. Teitel also spent time with the child during the holidays. The mother testified that the longest period of time that she had lived with Dr. Teitel was one week.
The mother testified that both she and Dr. Teitel had participated in family counseling with counselors in Millbrook and New York. According to the mother, she and Dr. Teitel sought the guidance of family counselors to promote healthy relationships and to facilitate a smooth transition for the child should the trial court allow the mother to move to New York with the child. The mother testified that she had taken the child to counseling with her in Millbrook and New York. The mother testified that she and Dr. Teitel continued to participate in counseling at the time of trial. The mother denied that she and Dr. Teitel were in counseling for problems in their marriage.
The mother testified that it was in the child's best interests to move to New York. According to the mother, the father and the child do not have a "father-son" relationship but are more like "pals." The mother testified that the father takes the child to work, to auctions, and to early morning garage sales. According to the mother, the child is treated more like a coworker than a child by the father. The mother testified that the child will live in a financially stable home with two parents in New York and that she will continue to be a full-time mother to the child. The mother stated that the child will benefit from continuing to live with her because the child will learn the value of education and because she will promote the importance of higher education. The mother testified that she helps the child with his reading skills and that, over the course of one year, she had checked out over 140 books for the child from the Millbrook Public Library. According to the mother, the father did not value education.
The mother testified that, since the parties' divorce, she had taken the child to all of his doctor appointments and that the child is now covered under Dr. Teitel's health insurance. According to the mother's testimony, she had enrolled the child in school in New York. *Page 956 
The mother told the trial court that she intended to encourage and support the relationship between the child and the father and suggested that the father receive liberal visitation. The mother testified that she planned on using the telephone, the Internet, and letters to encourage communication between the child and the father. According to the mother, the maternal grandparents plan on visiting New York often. The mother testified that her brother is completing his medical residency in New York. The record indicates that it is a 5-hour trip by airplane to New York from Montgomery and that it is a 20-hour trip by automobile.
Dr. Teitel is a gastroenterologist in private practice; he has practiced medicine for 20 years. He has two children, a son and a daughter, from a previous marriage. Dr. Teitel's son is a 24-year-old graduate student and lives in an apartment on Dr. Teitel's property in New York; his daughter is a 20-year-old college student. Dr. Teitel testified that his mother lives in Manhattan.
Dr. Teitel testified that he and the mother speak on the telephone three or four times daily when they are not in the same city. According to Dr. Teitel, he and the mother participate in counseling together as a proactive measure to avoid the pitfalls associated with joining two families together. Dr. Teitel testified that he had no intention of usurping the father's role as a parent to the child. Dr. Teitel expressed his support for liberal visitation between the child and the father and his support for the mother's decision to stay at home and care for the child. He also stated that he is financially capable of supporting such an arrangement. Dr. Teitel testified that he wanted to expose the child to the same cultural opportunities and experiences to which he had exposed his own son.
Several witnesses were called at trial to testify regarding the father's and the mother's relationship with the child. Sabrina Phillips, the father's child from a previous marriage, testified that the child and the father had a close relationship. On cross-examination, Phillips admitted that she had not seen the father in two years and that she had not had contact with the child since the parties' divorce. Betty McElwane, the father's sister, testified that the father and the child have a loving relationship. According to McElwane, the mother dedicated time to teaching the child and reading to the child but had had less "interaction" with the child after the child turned two years old. Richard McLemore worked with the father at the flea market and testified that the father and the child had a "great bond." According to McLemore, the child often accompanied the father to the flea market but was always supervised while at the flea market.
Charles Hollifield, a friend of the father and the mother, testified that each parent has a loving relationship with the child. Hollifield testified that he had observed the child around Dr. Teitel and that the child and Dr. Teitel got along well with each other. According to Hollifield, it would be in the child's best interests to be in the mother's custody. Hollifield described the mother as the more nurturing parent. Hollifield testified that the mother would offer the child a more stable environment and that a move to New York with the mother would provide the child with greater opportunities.
The guardian ad litem recommended that the child be allowed to move to New York with the mother. According to the guardian ad litem, the mother had presented sufficient evidence to rebut the presumption under the Act that a change in the child's principal place of residence was *Page 957 
not in the child's best interest. The guardian ad litem testified that he had seen no evidence indicating that a move to New York would adversely affect the child. The guardian ad litem opined that the move to New York would materially promote the child's best interest and welfare.
At the outset, we note that this court is limited in its review of a trial court's judgment when the trial court received ore tenus evidence. A trial court's judgment based on ore tenus evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court abused its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Scholl v.Parsons, 655 So.2d 1060 (Ala.Civ.App. 1995). However, where the question presented on appeal is whether the trial court correctly applied the law, the ore tenus rule has no application. Ex partePerkins, 646 So.2d 46 (Ala. 1994).
On appeal, the father contends that the trial court erred because, he contends, the trial court placed the burden of proof on him, the nonrelocating parent, as opposed to the mother, the relocating parent, as is required by the Act. Section 30-3-169.4
of the Act provides:
 "In proceedings under this article . . ., there shall be a rebuttable presumption that a change of principal residence of a child is not in the best interest of the child. The party seeking a change of principal residence of a child shall have the initial burden of proof on the issue. If that burden of proof is met, the burden of proof shifts to the non-relocating party."
The father focuses on a portion of the trial court's judgment in which the trial court found that the father had "failed to meet his burden of proof for a modification of custody." (Emphasis added.) However, we note that the trial court made no specific findings pertaining to the parties' respective burdens of proof under § 30-3-169.4 with regard to a change in the child's principal place of residence. "[W]hen the trial court's judgment does not contain specific findings of fact, this court must assume that the trial court made those findings necessary to support its judgment." Steed v. Steed, 877 So.2d 602, 603
(Ala.Civ.App. 2003) (citing Ex parte Bryowsky, 676 So.2d 1322
(Ala. 1996)).
Section 30-3-169.4 places the initial burden of proof on the party seeking the change in principal residence. If the party seeking the change in principal residence meets his or her burden of proving that the change in residence is in the child's best interest, the burden then shifts to the non-relocating party to demonstrate how the change in residence is not in the child's best interest. See § 30-3-169.4, Ala. Code 1975.
In the instant case, the record contains evidence from which the trial court could have found that the mother had rebutted the presumption that the change in principal residence was not in the child's best interest. The mother presented evidence indicating that she was the child's primary caregiver; that she supported the furtherance of the child's education; and that the move to New York would offer the child more cultural opportunities. Thus, under § 30-3-169.4 the burden shifted to the father to demonstrate that a change in principal residence is not in the best interest of the child. Given the record on appeal, we cannot say that the trial court overlooked the mother's burden of proof and impermissibly placed the burden of proof solely on the father.
The father also contends that the trial court failed to apply the correct standard of review in making its custody determination *Page 958 
under the Act. The father contends that the trial court erred in applying the child-custody-modification standard set forth in Exparte McLendon, 455 So.2d 863 (Ala. 1984). The father maintains that the trial court was required to apply the "best-interest-of-the-child" standard pursuant to the Act.
Initially, we note the well-settled rule of law that a parent seeking to modify an award of primary physical custody must demonstrate that the proposed change in custody will materially promote the child's best interests and welfare. Ex parteMcLendon, supra; Etheridge v. Etheridge, 712 So.2d 1089
(Ala.Civ.App. 1997). The parent must show that the benefits brought about by the proposed change in custody would more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, supra.
We have carefully reviewed the language in the Act and find nothing in the Act that preempts the application of theMcLendon standard in a child-custody-modification case such as the one before us. Before the creation of the Act, this court had recognized as a general rule that a change in a custodial parent's residence was a factor to be considered in determining the outcome of a modification petition. Moore v. Moore,585 So.2d 66 (Ala.Civ.App. 1991). The implementation of the Act did not change this general rule. Section 30-3-169.3 of the Act provides that a proposed change of principal residence of a child is a factor that a trial court may consider in determining whether to modify custody; the Act does not exclude a trial court's consideration of the factors set forth in McLendon. See
§ 30-3-169.3, Ala. Code 1975.
The father also contends on appeal that the trial court erred by failing to consider the evidence presented at trial in light of the factors listed in § 30-3-169.3 of the Act in making its custody-modification determination. Section 30-3-169.3 provides, in pertinent part:
 "(a) Upon the entry of a temporary order or upon final judgment permitting the change of principal residence of a child, a court may consider a proposed change of principal residence of a child as a factor to support a change of custody of the child. In determining whether a proposed or actual change of principal residence of a minor child should cause a change in custody of that child, a court shall take into account all factors affecting the child, including, but not limited to, the following:
 "(1) The nature, quality, extent of involvement, and duration of the child's relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child's life.
 "(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
 "(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.
 "(4) The availability and cost of alternate means of communication between the child and the non-relocating party.
 "(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties. *Page 959 
 "(6) The preference of the child, taking into consideration the age and maturity of the child.
 "(7) The degree to which a change or proposed change of the principal residence of the child will result in uprooting the child as compared to the degree to which a modification of the custody of the child will result in uprooting the child.
 "(8) The extent to which custody and visitation rights have been allowed and exercised.
 "(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.
 "(10) Whether the person seeking to change the principal residence of a child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating parent.
 "(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.
 "(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.
 "(13). . . .
 "(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.
 "(15) The reasons of each person for seeking or opposing a change of principal residence of a child.
 "(16). . . .
 "(17) Any other factor that in the opinion of the court is material to the general issue or otherwise provided by law."
As noted earlier, where a trial court receives ore tenus evidence, its judgment based on that evidence is entitled to a presumption of correctness. See Scholl v. Parsons, supra. "The presumption of correctness is based in part on the trial court's unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor." Littleton v.Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App. 1999). This court is not permitted to reweigh the evidence on appeal and to substitute its judgment for that of the trial court. Somers v.McCoy, 777 So.2d 141 (Ala.Civ.App. 2000); see also Ex partePerkins, 646 So.2d 46 (Ala. 1994).
The evidence presented in this case reveals that the father is self-employed and spends a substantial amount of his time at flea markets, garage sales, and auctions. The father frequently takes the child with him to work at the flea market. Other than the income he earns from sales at the flea market, the father receives no additional income. The father has no immediate family that lives in Alabama. The family member with whom the father shares his closest relationship is his sister who lives in Tennessee.
The mother is unemployed and stays at home with the child. Dr. Teitel, the mother's new husband, supports her decision to stay at home with the child. The mother has been the child's primary caregiver for the child's entire life, and she is focused on the child's educational needs. The mother's brother lives in New York, and the maternal grandparents plan on visiting *Page 960 
New York often. Dr. Teitel's immediate family lives in New York.
Both the mother and Dr. Teitel support liberal visitation between the father and the child. The mother and Dr. Teitel testified that they planned on promoting the bond between the father and the child. Dr. Teitel testified that he looked forward to exposing the child to cultural opportunities available in the New York area that the child might not otherwise experience, such as taking the child to the theater and museums. Dr. Teitel also expressed a desire to take the child to New York Giants professional football games and the zoo.
The father and the mother both presented evidence regarding their relationship with the child and their fitness as parents. It is clear that both parties love the child and want the trial court to act in the child's best interest. There was ample evidence presented to the trial court from which it could have found that it was in the child's best interest to move with the mother to New York. During the time that the child has been in the mother's custody, the mother has seen to the child's medical needs and educational needs. There is little evidence that the mother's devotion to the child's needs will change after moving to New York. Also, the mother has participated in counseling, along with Dr. Teitel and the child, to encourage a smooth transition for the child in New York.
The evidence supports the trial court's determination that the child's best interest and welfare will not be materially promoted by transferring custody of the child to the father. Ex parteMcLendon, supra. There is no doubt that the mother's move to New York represents a significant transition in the child's life. However, the benefits the child will receive by moving to New York with the mother, the mother's role as the child's primary caregiver, and the mother and Dr. Teitel's willingness to support a continuing relationship between the father and the child support the trial court's judgment allowing the mother to move with the child to New York and denying the father's petition to modify. Therefore, we cannot say that the trial court erred in entering its judgment denying the father's petition to modify custody.
Both parties' requests for an attorney fee on appeal are denied.
AFFIRMED.
MURDOCK and BRYAN, JJ., concur.
PITTMAN, J., concurs specially, with writing.
CRAWLEY, P.J., recuses himself.