STUART, Justice.
Adam G. Terry (“the father”) petitioned this Court for a writ of certiorari to review the judgment of the Court of Civil Appeals reversing an order of the Lawrence Circuit Court enjoining Emily Brackin Terry (“the mother”) from relocating from Lawrence County to Charleston, South Carolina, with their son (“the child”). See Terry v. Terry, 154 So.3d 993 (Ala.Civ.App.2013). We granted the father’s petition to consider whether the Court of Civil Appeals erred by reversing the trial .court’s judgment and directing the trial court to enter a judgment in favor of the mother. We affirm in part and reverse in part.
I.
The father and mother had a child together in May 2007; they were not married. Following a paternity action in the Lawrence Juvenile Court, the father and mother were awarded joint legal custody of the child, and the mother was awarded primary physical custody, subject to the father’s visitation. In January 2011, the mother became engaged to Joshua Terry, a fourth-year medical-school student.[1] At that time, Joshua was applying for postgraduate residence programs. Although Joshua’s first choice was the University of *1004 Alabama at Birmingham, on March 15, 2011, he was ultimately “matched” with a program at the Medical University of South Carolina in Charleston, South Carolina.[2] The mother subsequently notified the father pursuant to the requirements of the Alabama Parent-Child Relationship Protection Act (“the Act”), § 30-3-160 et seq., Ala.Code 1975, that she intended to move with the child to Charleston. The father opposed the move and petitioned the trial court to enjoin the move or, in the alternative, to award him sole physical custody of the child. In June 2011, the mother and Joshua married, and the child was subsequently allowed to move to South Carolina with them while this action was pending.
An evidentiary hearing was thereafter held. At the outset of that hearing, the trial court stated that it was there to consider “the relocation matter,” a petition seeking “a modification of custody” filed by the father, and “various contempt charges that have been filed as well.” The trial court then stated:
“The Court also notes that pursuant to the [Alabama] Code, § 30-3-169.4,[3] it’s the burden of [the mother] to rebut the presumption that the change of residence of the child ... is not in the child’s best interest. So we will proceed first with her testimony on that issue.”
The mother then proceeded to question the father, give her own testimony, and submit deposition testimony from Joshua. The Court of Civil Appeals summarized the evidence adduced by the mother as follows:
“At the hearing on the parties’ respective pleadings, the father, who was 27 years old at the time of the hearing, testified that he was single and lived in a house in Trinity, in Lawrence County, that had belonged to his grandparents. The father testified that he was in a relationship with a woman who lived in Mississippi, that he hoped to marry, but that he did not intend to move to Mississippi.
“The father worked for Naffco, a business that sells fire engines. His sales territory included north Alabama and all *1005 of Mississippi and Tennessee. The father said that he traveled for work and estimated that he stayed out of town overnight between four and six nights a month. The father was also required to travel to Pennsylvania for work a few times each year.
“The mother testified that the child, [Joshua], and she lived in a gated community in a suburb of Charleston. At the time of trial, the child was four years old and attended a day care across the street from where the mother worked as a registered nurse for a gastroenterolo-gy center. The mother said she was never required to travel for work and that she was able to be home with the child every evening. She and [Joshua] both described their life in Charleston, saying that they had joined a church there and that the child had made friends in the area. The evidence indicated that the child did not attend church with the father. The mother testified regarding cultural and historical sites the child had visited in Charleston that were not available in Lawrence County, such as a children’s museum, an aquarium, Fort Sumter National Monument, and the USS Yorktown, a World War II aircraft carrier.
“The father said that he frequently spoke to the child on the telephone, but he complained that the mother was listening to the conversations by putting the father’s calls on the speakerphone. The mother testified that the child, who was four years old at the time, had learned to put the calls on the speakerphone after the mother allowed the child to talk to the father on the speakerphone as the child took a bath. The mother said that the child’s attention span for a ‘normal’ telephone conversation was ‘not that long1 and that the child would put the father’s calls on the speakerphone while he played. The mother said she did not intend to monitor the father’s conversations with the child, but she had become concerned when she overheard the father tell the child that South Carolina was not the child’s home. The mother said that, because they were living in South Carolina, she believed that South Carolina was the child’s home, and she did not believe the father’s comment was appropriate to tell a four-year-old child.
“Much of the testimony involved the parties’ inability to reach an agreement regarding a visitation schedule, who would be required to travel for visitation, and who would be responsible for the costs associated with travel. There has been more than one visitation schedule entered in this matter, and the parties have gone to mediation in an attempt to work out a schedule between them. That effort was unsuccessful. The mother testified that she had discussed visitation issues with her attorney, and she believed that she was abiding by the schedule that was currently in place.
“The father testified that he had continued to exercise his visitation after the child moved to South Carolina, and he acknowledged that, in fact, he was spending the same number of days with the child each month as he had before the child moved. The record also indicates that there had been conflict between the mother and the father when meeting to transfer the child, so the transfers have been carried out in public places, such as fast-food restaurants. The mother submitted a proposed visitation schedule that would provide the father with extended visitations around the holidays and during the summer. She also offered to let the father have additional visitations with the child in Charleston if the father visited there. *1006 The father proposed a visitation schedule that would require the child to use Thanksgiving Day and Christmas Day as travel days between the parties’ residences. The mother objected to that proposal on the basis that it would not be in the child’s best interest.
“The father testified that he had taken vacations during the pendency of this litigation, but he had not traveled to South Carolina to see the child. The father said that he went to New Orleans when the University of Alabama played in the National Championship football game in January 2012, but he did not have a ticket to attend the game. The father also traveled to two away games to see Alabama play football. The mother recalled an instance when the child’s maternal grandmother returned the child after the father’s scheduled weekend visitation because the father had gone out of state to see an Alabama football game. The father said that he also took a vacation to Gulf Shores, although he was aware that the child lived within minutes of a beach in South Carolina.
“The mother and [Joshua] are both from Lawrence County and have family in the area. When [Joshua’s] sister married, the child was in her wedding. The mother, [Joshua], and the child traveled from South Carolina to Lawrence County on the Friday before the Saturday wedding and returned home the day after the wedding. The father complained that the mother had not allowed a visit during that weekend. The father also complained that the mother had not allowed him to spend time with the child on the two other occasions when she and the child had returned to Alabama for a visit. The mother testified that the father had exercised a lengthy visitation just before one of those trips. She also said that the father had turned down offers totaling five weeks of visitation with the child. Because he had turned down those offers of visitation, the mother said, she did not believe the father should be entitled to visit with the child during her vacations with the child. The mother and [Joshua] testified that, because of their work schedules, they did not have the opportunity to have long vacations in Alabama. [Joshua] said that he and the mother hoped to return to north Alabama when he completed his residency, but, he said, whether he would be able to obtain a job as an anesthesiologist in north Alabama at that time would be dependent on the job market.
“The evidence also indicated that the father had, on at least one occasion, refused to meet the mother at a location between Lawrence County and Charleston and that he did not take advantage of the visitation available to him on that occasion. When the father was asked whether he would expect the mother to travel from South Carolina for visitations with the child if the father was awarded custody, the father said he would be willing to drive the child to Georgia every other weekend if necessary. He also said that he did not believe that that much travel would be in the child’s best interest, adding, T think the best interest of the child is for both parties to live here in Alabama and remain [sic] semblance of a normal family as much as possible.’
“The mother testified that she intended to encourage the child to have a relationship with the father. The father said that, after the mother and the child moved to South Carolina, the father had taken the child to a counselor, and he conceded that there was no evidence indicating that the child had symptoms *1007 of separation anxiety or an attachment disorder.”
Terry, 154 So.3d at 995-97. At the close of the mother’s case, a recess was held. After that recess, the following colloquy took place:
“COURT: We just took a short break and the court spoke with the attorneys. Is there anything else from you, [the mother’s attorney], at this time?
“[MOTHER’S ATTORNEY]: Not on this issue, Judge.
“[COURT]: Okay. And, [the father’s attorney], understanding there are other issues, do you have anything at the present time?
“[FATHER’S ATTORNEY]: Not at this time, Judge.
“[COURT]: Okay. The question before this court first is — there is a presumption in the law that a parent is not to relocate outside of the State or more than ninety miles. I have to rule on that presumption before I can look any further at the other issues. Therefore, I’m going to have to take some things under advisement. I’m going to have to look at the testimony. I’m going to have to go into the Code and look up some caselaw. So until that time, I’m going to issue an order that sets forth some visitation for [the father]. I will do that in the next day or so as quickly as I can. And the parties are to abide by that order. Once I issue my ruling, we may have the need for subsequent hearings or may not. So we will go forward at that point.”
On May 27, 2011, the trial court entered an order finding that the mother had not met her burden of showing that the move to Charleston was in the child’s best interest and ordering that the child be returned to Lawrence County. In that order, the trial court stated:
“There is little doubt in this court’s mind that [the mother] has been the primary caregiver to this child. However, this move to South Carolina involves a host of factors that affect the child. While the child does not seem to be suffering any negative effect, his father and joint legal custodian is. As the child has yet to begin school, a change of his principal place of residence from Alabama to South Carolina has not impacted him. To a certain degree, the change has not uprooted him though he is now living in an area where there is no support system. Other than his mother and stepfather, [his] closest relatives, including his father, paternal grandparents, maternal grandparents, and step-grandparents, reside in Lawrence County, Alabama.
“This move has increased travel time for the parties as the mother has moved with the child some eight to nine hours away. Such a move does not allow for a feasible and suitable visitation schedule. Visitation rights, such as Thanksgiving, afforded to this father through previous court orders have not been followed. This court cannot fathom why this mother would not want her child, that lives some 400 miles away from his father, to have visitation -with him when she comes home to Lawrence County, other than to be spiteful and hurtful to [the father]. On two separate occasions on October 29, 2011, and December 16, 2011, [the mother] was in town and did not offer nor even suggest to [the father] that he could see his child. Although the child was here from February 19, 2012, until February 26, 2012, [the mother] afforded [the father] a mere one hour of visitation. Such action is uncalled for- and is further proof to this court that [the mother] has no intention of fostering and facilitating a necessary father/son relationship. This court does not be *1008 lieve that [the mother] will comply with any new visitation arrangement nor is she disposed to foster a joint parenting arrangement with [the father].
“Based upon the Alabama Parent-Child Relationship Protection Act, this Court does hereby find the mother ... has failed to meet her burden of proof pursuant to § 30-3-169.4 and the rebut-table presumption that a change of a principal residence of a child is not in the best interest of said child. It is therefore not in the interest of the minor child for his residence to be relocated from Lawrence County, Alabama, and [the mother] is hereby ORDERED to return the minor child to the State of Alabama. The minor child shall return to Lawrence County, Alabama, within thirty (30) days of the entry of this order.
“This court is aware that this order will create a hardship on [the mother]. However, it is a hardship partially of her own creation. In advance of her wedding she was aware of [the] existence of this relocation language in [the previous trial court judge’s] order. [The mother] was also aware of this possibility once the objection was filed by [the father].”
(Capitalization in original.) The mother appealed the trial court’s judgment to the Court of Civil Appeals, which reversed the judgment, holding that the mother had met her burden and had presented sufficient evidence to support a finding that relocation was in the child’s best interest. Terry, 154 So.3d at 999. The Court of Civil Appeals further held that the father had not met his burden of demonstrating that the move was not in the child’s best interest and that the trial court had accordingly exceeded its discretion in refusing to allow the mother to relocate the child to South Carolina. Id.
The father applied for a rehearing, arguing that the Court of Civil Appeals should not have reversed the trial court’s judgment and instructed it to enter a judgment consistent with the Court of Civil Appeals’ opinion but should have instead remanded the case to allow the father to present his case-in-chief. Such action was required, the father argued, based on the shifting burdens outlined in § 30-3-169.4 (“The party seeking a change of principal residence of a child shall have the initial burden of proof on the issue [of whether relocation is in the child’s best interest]. If that burden of proof is met, the burden of proof shifts to the non-relocating party.”). The Court of Civil Appeals then withdrew its opinion and substituted a new opinion in which it specifically held that, “[i]f the father wished to rebut the mother’s evidence, the time to do so was at the hearing on the issue of the child’s relocation.” Terry, 154 So.3d at 1002. In accordance with that holding, the Court of Civil Appeals again reversed the judgment of the trial court and ordered that court to enter a judgment consistent with the Court of Civil Appeals’ opinion. The father then petitioned this Court for certiorari review of that opinion, and, on April 10, 2013, we granted his petition.
II.
In his petition and supporting briefs, the father argues that we should reverse the judgment of the Court of Civil Appeals because, he argues, that court failed to properly apply the ore tenus rule and instead reweighed the evidence and substituted its judgment for that of the trial court. See, e.g., Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996) (“When evidence in a child custody case has been presented ore tenus to the trial court, that court’s findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a *1009 custody determination — it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore terms before the trial court in a custody hearing.”). The father further argues that, even if we see no merit in his first argument and affirm the Court of Civil Appeals’ holding that the mother overcame the initial rebuttable presumption in § 30-3-169.4, we should remand the case for the trial court to allow him to attempt to meet the burden of proof that, he says, has now shifted to him. Until now, the father argues, he has never borne the burden of proof in this case, and it would be improper under the Act to deny him the opportunity to meet that burden. See Toler v. Toler, 947 So.2d 416, 421 (Ala.Civ. App.2006) (“The mother [as the relocating party] bore the initial burden of proof as to whether a change of principal residence was in the son’s best interests .... Until that burden of proof was met, the burden of proof in the present case did not shift to the father.”).
In considering whether the mother successfully rebutted the initial presumption of § 30-3-169.4, the Court of Civil Appeals stated:
“In Clements v. Clements, 906 So.2d 952, 957 (Ala.Civ.App.2005), this court wrote of the presumption:
“ ‘Section 30-3-169.4 places the initial burden of proof on the party seeking the change in principal residence. If the party seeking the change in principal residence meets his or her burden of proving that the change in residence is in the child’s best interest, the burden then shifts to the non-relocating party to demonstrate how the change in residence is not in the child’s best interest. See § 30-3-169.4, Ala.Code 1975.’
“The facts in Clements are similar to those in this case. The mother and the father in Clements lived in Autauga County when they divorced. The mother was awarded primary physical custody of their child. A year after the divorce, the mother married a physician who lived in Somers, New York, and she notified the father that she intended to move to New York with the child. The father objected, arguing, among other things, that the distance between him and the child would prohibit him from exercising visitation as often as he would like and that he was concerned he would have ‘no relationship’ with the child if the child moved to New York. Id. at 954.
“In affirming the trial court’s judgment allowing the mother to relocate with the child, this court noted:
“ ‘The mother presented evidence indicating that she was the child’s primary caregiver; that she supported the furtherance of the child’s education; and that the move to New York would offer the child more cultural opportunities. Thus, under § 30-3-169.4 the burden shifted to the father to demonstrate that a change in principal residence is not in the best interest of the child.’
“Id. at 957.
“In this case, too, the mother presented evidence indicating that she had always been the child’s primary caregiver. The mother testified that she worked across the street from the child’s day care and that she was home with the child every night. Like the child in Clements, the child in this case had not yet begun school, but the mother testified regarding the cultural opportunities the child had in Charleston that were not available in Lawrence County. The mother was married and her husband was taking an active role in assisting her *1010 with the child. There is no evidence indicating that the mother wished to move to South Carolina merely to stifle the relationship between the father and the child. The undisputed evidence indicated that the move was required for [Joshua] to take part in a residency program. Without completing the residency program, [Joshua] would not be able to practice medicine. We conclude that the mother presented sufficient evidence to support a finding that the relocation was in the child’s best interest. Therefore, pursuant to § 30-3-169.4, the burden shifted to the father to demonstrate that the relocation was not in the child’s best interest.”
154 So.3d at 999. We agree with this general analysis. However, we are persuaded by the father’s argument that he should be presented an opportunity to argue his case before a judgment is entered in the mother’s favor.
At the start of the hearing in the trial court, the trial court decided that, because the mother bore the initial burden of proof under § 30-3-169.4, she should present her evidence first. As part of her case, the mother’s attorney first questioned the father. Following that questioning, the father’s attorney stated that he would “reserve [his] examination [of the father] until we put on our case if I may.” The trial court responded “okay,” and the mother then gave her testimony, after which she was cross-examined by the father’s attorney. The deposition of Joshua was then read, and, following an off-the-record discussion between the trial court and the attorneys, the mother rested her case. The trial court then recognized that “there are other issues” but' asked the father’s attorney if he had “anything at the present time.” The father’s attorney responded “[n]ot at this time.”
As quoted, supra, the trial court judge then stated that he had “to rule on [the § 30-3-169.4] presumption before [he could] look any further at the other issues” and that, once he ruled on that presumption, “we may have the need for subsequent hearings.” It is clear from these final comments, as well as other comments made by the attorneys and the trial judge throughout the hearing, that the trial court and the parties contemplated those subsequent hearings not just to consider the separate issues raised by the parties, i.e., the father’s petition to modify custody and the outstanding contempt charges, but to fully resolve “the relocation matter” if it was determined that the mother had successfully rebutted the initial § 30-3-169.4 presumption and shifted the burden of proof to the father. Until that determination was made, the father did not bear the burden of proof, and it is evident that the trial court intended to provide him with an opportunity to meet that burden if it was determined that the burden of proof had indeed shifted. See § 30-3-169.4 and To-ler, 947 So.2d at 421.
The legislature has set forth this state’s general policy regarding joint-custody arrangements as follows:
“It is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or dissolved their marriage.... ”
Section 30-3-150, Ala.Code 1975. See also Knight v. Knight, 53 So.3d 942, 959 (Ala. Civ.App.2010) (Bryan, J., concurring in part and dissenting in part) (“The standard, as supported by the enunciation of the public policy of this State in § 30-3-150 and- § 30-3-160, [Ala.Code 1975,] is *1011 that the child needs both parents.”). In light of this legislative pronouncement that children should have “frequent and continuing contact with parents,” the fundamental importance of a parent’s right to have an active part in the raising of his or her child, and the apparent understanding of the trial court and the father that the father would have an opportunity to present evidence indicating that a change of the child’s principal residence was not in the child’s best interest if the burden of proof as to that issue shifted to him, we reverse the judgment of the Court of Civil Appeals to the extent it decided otherwise.
However, we emphasize that our holding is limited to the unique facts in this case. As a general rule, piecemeal litigation is discouraged because it often wastes scarce judicial resources. Ex parte Breman Lake View Resort, L.P., 729 So.2d 849, 851 (Ala.1999). Thus, the procedure followed by the trial court in the instant case should be avoided in future parental-relocation cases' or, for that matter, any other case involving shifting burdens of proof. Rather, in a parental-relocation case, both parents should present their entire case in the initial proceeding, and the trial court should then consider all the evidence when determining, first, whether the relocating parent met his or her initial burden of proving that a change in the child’s principal residence is in that child’s best interest, and, if then necessary, whether the nonrelocating parent subsequently established by the greater weight of the evidence that a change in the child’s principal residence was not in the child’s best interest. § 80-3-169.4.
III.
The father petitioned this Court for cer-tiorari review of the Court of Civil Appeals’ judgment holding that the trial court erred in concluding that the mother did not meet her burden of rebutting the § 30-8-169.4 presumption that the move to South Carolina was not in the child’s best interest. We now affirm that court’s judgment in that respect. However, insofar as the Court of Civil Appeals’ judgment directed the trial court to enter a judgment in favor of the mother on remand, that judgment is reversed. Instead, on remand, the father should be presented an opportunity to present his evidence and arguments supporting his position that a change in the child’s principal residence is not in the child’s best interest. Following the presentation of that evidence, the trial court is to enter a judgment based on the totality of the evidence presented at both the hearing held on remand and the earlier hearing.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
BOLIN, PARKER, SHAW, and MAIN, JJ., concur.
MURDOCK, J., concurs in the result.
MOORE, C.J., and WISE, J., dissent.
BRYAN, J., recuses himself.**

. The father and the mother were never married, nor did they ever live together. It appears to be just a coincidence that the father and the mother’s husband have the same last name; there is no indication they are related.

. The "matching" process for graduating medical-school students is described in National Resident Matching Program v. Electronic Residency LLC, 720 F.Supp.2d 92, 96 (D.D.C.2010), as follows:
"National Resident Matching Program ('NRMP') is a not-for-profit corporation that conducts 'the Match,’ an annual program through which senior medical students apply and are assigned to open medical residency positions. To participate in the Match, an applicant must register with NRMP and comply with the terms of a contractual agreement, the ‘Match Participation Agreement.’ Each applicant provides NRMP with a list ranking the residency programs to which the applicant wishes to be assigned; each residency program, in turn, submits to NRMP a list ranking the applicants that it is willing to hire. Once those lists are entered into a database, NRMP runs a computer program that pairs applicants with open positions in a manner calculated to produce ‘optimal matches of applicants to programs.’ ”
(Internal citations omitted.)

. Section 30-3-169.4, Ala.Code 1975, provides:
"In proceedings under this article unless there has been a determination that the party objecting to the change of the principal residence of the child has been found to have committed domestic violence or child abuse, there shall be a rebuttable presumption that a change of principal residence of a child is not in the best interest of the child. The party seeking a change of principal residence of a child shall have the initial burden of proof on the issue. If that burden of proof is met, the burden of proof shifts to the non-relocating party.”
There is no allegation in the record that the father has ever committed domestic violence or child abuse.