THOMPSON, Presiding Judge.
Amanda Leigh Williams ("the mother") appeals from a judgment of the Clay Circuit Court ("the circuit court") in this custody dispute involving the mother's request to relocate to Gulf Breeze, Florida, and the request of Robbie Lynn Williams ("the father") for a custody modification in which he sought sole physical custody of the parties' children.
The record indicates the following. The mother and the father divorced in December 2013, and the parties were awarded joint legal and physical custody of the parties' children ("the children"). In March 2016, the mother provided the father with a letter stating her intention to relocate to Gulf Breeze, Florida. The father then filed in the circuit court an objection to the relocation, a petition for contempt, and a request for custody modification. The mother filed an answer and counterclaim in which she set forth the reasons for her desire to relocate. In her pleadings the mother did not request a custody modification.
At the time of the hearing in this action, the children were 13 and 10. They were in the eighth grade and the fifth grade, respectively. Pursuant to the parties' divorce judgment, the mother and the father were to exchange custody every seven days; however, "primary placement" of the children was vested with the mother. The father testified that the custody arrangement was not strictly adhered to because, he said, the parties were "trying to let the-let the kids come and go as they wanted to." However, he said, he had the children on most weekends and estimated that, between the time of the divorce and the hearing, he had the children 50% to 60% of the time. The mother disputed that testimony, saying that she had been the children's primary caregiver and had had the children with her approximately 80% of the time until she notified the father of her intent to move to Gulf Breeze, a suburb of Pensacola, Florida. The parties' older child testified and corroborated the mother's assertion that the children stayed with her most of the time. When she notified the father of her intent to move, the mother said, she received a letter from the father's attorney saying that, from that point forward, the parties were going to exercise visitation as it had been set forth in the divorce judgment.
The father has remarried since the divorce. The mother testified that she intended to remarry in November 2016. She said that the same month the parties were divorced-December 2013-she moved to Trussville to live with her fiancé ("the fiancé"). The next month-January 2014-the mother and the fiancé moved to Wedowee. Later, the father failed to make a number of payments on the marital residence in Talladega, so, to assist the father, the mother agreed with him that she *829 would pay the father $10,000 to pay off the mortgage arrearage. The mother and the fiancé then moved into what had been the parties' marital residence, and the father moved to a house approximately one mile from that residence. The house that had been the marital residence was apparently still in the mother's possession at the time of the hearing.
The mother testified that the reason she was asking to relocate to Florida was because, she said, the move would be beneficial to the fiancé's business. The mother testified that the fiancé sold advertising for automobile dealerships. The business required frequent travel, and the mother said that Gulf Breeze, Florida, was more conveniently located to airports than was their Alabama residence. The mother also testified that cellular-telephone service and Internet service were sporadic at the Talladega residence, making it difficult for the fiancé to operate his business from there.
The mother testified that she had essentially been the children's primary caregiver since the divorce. The father testified that, since the divorce, he had taken the children to see the doctor on four occasions. The mother agreed with the father's testimony, but she added that she had also been present on three of those occasions. The father said that he had never taken the children to the dentist and that he did not know who their dentist was.
The father testified that, during the marriage, the parties had for a time homeschooled the children because they were not happy with the public-school system the children would have attended. In the three years before the hearing, the children had attended a private school in Clay County. The mother said that the older child's grades had dropped after the divorce and that she had become concerned. She said that she met with the older child's teachers to learn what was affecting the child's grades and what she could do to help the child. The mother said that she learned that the child was not turning in his homework when he was staying with the father. The mother worked with the teachers to allow the child to make up some of his work, and the child passed the school year. The father did not dispute the mother's testimony. When asked about the children's grades, the father said: "The children do pretty well in school. [The younger child], she's an A and B student. [The older child], he does pretty well most of the time. But being a boy, sometimes he, you know, struggles some."
The older child testified that, often when he was at the father's house and asked for help with his homework, he was told that the father and his wife ("the stepmother") were watching a movie or cooking. He said that, when he was in the mother's custody, the mother and the children's maternal grandmother ("the maternal grandmother") often helped him with his homework.
The mother and the older child also testified that the father was not involved with the children's extracurricular activities. The mother testified that the maternal grandmother or she ensured that the children arrived at their various practices and ball games. The mother and the older child both said that the father rarely attended the children's games. The older child testified that the father had attended three of his football games over two years. The father said that the mother's testimony regarding his involvement with the children was "incorrect," and he also said that he took the older child hunting and fishing.
The older child testified that he wanted to live with the mother. He told the circuit court that he did not like his stepmother and said that she was mean to the children. He also said that, since the father remarried, the father did not pay as much attention to the children. The older child *830 said that he tried to talk to the father about the lack of attention and that the father told him that the stepmother was a "grown up." The older child said that the children liked the fiancé. The older child told the circuit court that no one had told him what to say in court.
The fiancé had been convicted in Texas of a nonviolent offense and had served a ten-year prison sentence. At the time of the hearing, he had also completed his probation. The mother's father ("the paternal grandfather") testified that, at first, he had been wary of the fiancé because of his history, but, the maternal grandfather said, he had grown to like the fiancé. The evidence is undisputed that the father never objected to the fiancé's presence around the children, and, in fact, the father and the fiancé were friendly with each other.
The mother testified that Gulf Breeze was four hours from the father's residence. She said that Greenville was halfway between the two and that she was willing to meet the father there. The mother also testified that she had performed research into the public schools the children would attend if they were permitted to move to Florida. The elementary school the younger child would attend is five miles from the house where they would live; the middle school the older child would attend is a half mile from the house. The mother testified that both schools were in the top 25% of Florida schools. She said that both schools offered the children better academics and more opportunity than the school they currently attended. The older child testified that he had seen the school he would attend in Florida and that he liked it. Additionally, as the mother noted in her letter to the father regarding the proposed relocation, there are also nearby charter schools and private schools. The mother stated in the letter: "Of course you and I will have to establish which option we think is best."
In her letter to the father, the mother told the father that the move would benefit the children, explaining:
"Academically and socially this will be a step into a new chance to meet new friends, see new things and see potential to do and be anything they want to be with hard work and effort. I don't want our kids to struggle to make ends meet like we did and I don't want them to feel like they are stuck in a small town with no opportunity at all and only min[imum] wage and 40-60 hr work week with no advancement. We can offer them opportunity and teach them to embrace it or we can teach them to be scared of change and complain about things we didn't change later in life."
The mother also testified that her parents, who she described as the "go to" grandparents when the parties needed assistance with the children, were planning on moving to Gulf Breeze if the mother was permitted to relocate with the children. In addition, the mother said, she had cousins in several towns in the Florida panhandle. The mother also said that she had several relatives in Clay County with whom she and the children would visit. The mother said that she did not want to deny the father time with the children and that she intended to foster their relationships.
The father testified that he was against the relocation because, he said, Florida was a new environment for a 10-year-old and a 13-year-old, Florida is "very overpopulated," and that "meeting new friends, meeting new people like that, it's scary to a 10-year-old and a 13-year-old." He said that the children had always lived in Clay County and that all of their family lived in the area. The father testified that he wanted to be able to take the older child hunting *831 and fishing. However, he acknowledged that, because he worked during the week, he would generally be able to do so only on weekends. The father also testified that he did not know anything about Gulf Breeze. He said that he had looked for the school system on a map, but he had not done any research or made a comparison of the schools in Florida with the children's school in Clay County.
On August 11, 2016, two days after the hearing, the circuit court entered a judgment denying the mother's request to relocate. The circuit court also ordered the parties to continue to share joint legal custody, but it awarded "primary physical custody" of the children to the father. The mother filed two postjudgment motions, one to alter, amend, or vacate the judgment and the other to set aside the judgment. The trial court denied both motions on September 14, 2016. The mother filed a timely notice of appeal.
Our standard of review in matters involving child custody is well settled. "When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct." Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996). "[W]e will not reverse [a child-custody determination based upon ore tenus evidence] unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown." Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ. App. 1993).
The mother contends that the circuit court erred in denying her request to move to Florida with the children, arguing that she had rebutted the presumption that the move was not in the children's best interest. The Alabama Parent-Child Relationship Protection Act ("the Act"), § 30-3-160 et seq., Ala. Code 1975, "promotes the general philosophy in this state that children need both parents, even after a divorce, [as] established in Section 30-3-150[, Ala. Code 1975]."[1] § 30-3-160, Ala. Code 1975.
"Section 30-3-169.4 [of the Act] places the initial burden of proof on the party seeking the change in principal residence. If the party seeking the change in principal residence meets his or her burden of proving that the change in residence is in the child's best interest, the burden then shifts to the nonrelocating party to demonstrate how the change in residence is not in the child's best interest. See § 30-3-169.4, Ala. Code 1975."
Clements v. Clements, 906 So.2d 952, 957 (Ala. Civ. App. 2005).
We first note that, as previously mentioned, the mother never requested a modification of custody in this matter. From our review of the pleadings and the transcript contained in the record on appeal, it looks as though the mother assumed she had sole physical custody of the children and, thus, did not make an effort to obtain sole physical custody. She appears to have disregarded the language in the divorce judgment awarding the parties' "joint physical custody" and instead relied solely on the language in that judgment that vested "primary placement" of the children with her, thereby assuming that she had *832 sole physical custody of the children. She did so at her peril.
A copy of the parties' divorce judgment does not appear in the record on appeal. However, it is undisputed that, in that judgment, the parties were awarded joint legal and physical custody. The father testified that, under the terms of the divorce judgment, which incorporated a settlement reached by the parties on the issue of custody, the parties were to rotate the custody of the children on a weekly basis. The agreement also is not included in the record on appeal. However, the father testified that the agreement called for "primary placement [to be] vested with the mother."
In New v. McCullar, 955 So.2d 431 (Ala. Civ. App. 2006), this court was asked to determine which custody-modification standard to apply when a divorce judgment awarded the parents in that case joint physical custody but added that " 'the child's primary residence shall be with the [mother], subject to all rights of visitation on the part of the [father].' " Id. at 432. This court first set forth the meaning of "joint physical custody" as that term is defined in § 30-3-151(3):
" '[P]hysical custody ... shared by the parents in a way that assures the child frequent and substantial contact with each parent. Joint physical custody does not necessarily mean physical custody of equal durations of time.' "
Id. at 435. The court went on to explain:
"The custody arrangement set forth in the parties' agreement and incorporated into the divorce judgment fits within this statutory definition of 'joint physical custody.' The agreement provided that the parties would share 'joint legal and joint physical custody' of the child. The judgment provided for the child to reside with the father almost one half of every month during the school year and approximately one half of each summer. It also provided that the child would spend approximately one half of certain designated holiday periods with the father. That arrangement clearly 'assures the child frequent and substantial contact with each parent.' § 30-3-151(3)."
Id. The court concluded that, to the extent that the judgment was internally inconsistent, it in fact "created a joint-physical-custody arrangement, as defined by § 30-3-151(3)." Id. at 436.
The New court also pointed out that the evidence showed that both parties in that case "had frequent and substantial contact with the child" and that each party took an active part in the child's activities. Id. at 435. The court stated that it did "not consider it material that the mother had custody for a majority of the time each month," noting that the statute does not require equal durations of custodial time. Id.
The evidence in the present case was disputed as to the amount of time each party spent with the children. The father presented evidence indicating that he had custody at least half of the time; the mother claimed she had custody as much as 80% of the time. The older child's testimony supported the mother's claim. The evidence was also disputed as to the amount of time the father spent with the children during their extracurricular activities. When evidence is in conflict, "it is the trial court's duty to resolve those conflicts in the evidence, and it is this court's duty to determine solely whether the trial court's findings are supported by substantial evidence. Pearson v. Reflector Hardware Corp., 710 So.2d 443, 445 (Ala. Civ. App. 1997)." V.I. Prewett & Son, Inc. v. Brown, 896 So.2d 564, 569 (Ala. Civ. App. 2004).
Additionally, we can find no meaningful difference between the language used in *833 the divorce judgment in this case and that used in the divorce judgment at issue in New. The divorce judgment in this case awarded the parties joint physical custody and established a custody schedule pursuant to which the parents would exchange custody weekly. As in New, the divorce judgment established an "arrangement [that] clearly 'assures the child[ren] frequent and substantial contact with each parent.' § 30-3-151(3)." Id. at 435.
Accordingly, we conclude that the divorce judgment awarded neither party sole physical custody and directed that the parties were to rotate custody each week. As mentioned, the mother did not seek to modify custody. In seeking to move to Gulf Breeze with the children, the mother failed to make any reference to the custody schedule or how the proposed move would affect the children's school schedules, extracurricular schedules, and the like. Although the circuit court did not make specific findings of fact in denying the mother's relocation request, we do not see how it could be in the children's best interest to spend every other week in Florida and every other week in Clay County. That schedule is clearly untenable for school-aged children. When a judgment fails to include specific findings of fact, "appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous." Ex parte Bryowsky, 676 So.2d at 1324.
Based on our standard of review, the evidence presented, and the mother's failure to request a custody modification either in her pleadings or during the trial of this matter, we cannot say that the circuit court erred in denying the mother's request to relocate to Florida with the children.
The mother also contends that the father failed to meet his burden under Ex parte McLendon, 455 So.2d 863 (Ala. 1984), which requires a parent seeking to modify a previous custody award to demonstrate that a material change in circumstances has occurred such that a change of custody would materially promote the children's best interests and that the benefits of the change would offset the disruptive effect of the change in custody. McLendon, 455 So.2d at 866 ; Ex parte Cleghorn, 993 So.2d 462, 468-69 (Ala. 2008). The father counters that the McLendon standard is not applicable in this case because, he says, the previous custody judgment awarded the parties joint physical custody of the children. Therefore, the father says, the "best interests of the child" standard set forth in Ex parte Couch, 521 So.2d 987, 989 (Ala. 1988), is applicable in this case.
Alabama appellate courts have explained the circumstances under which each standard involved in a custody-modification case is applied.
"The determination whether the McLendon standard or the 'best interests of the child' standard set forth in [ Ex parte] Couch [, 521 So.2d 987, 989 (Ala. 1988),] applies turns on whether there has been a previous custody determination as between the two parents. If no previous custody determination has been made, or if a custody determination has been made that does not favor one parent over the other, such as an award of joint custody pursuant to which the parties share both joint legal custody and joint physical custody, see § 30-3-151(1), Ala. Code 1975, the 'best interests of the child' standard applies. New v. McCullar, 955 So.2d 431, 434 (Ala. Civ. App. 2006). However, if a previous custody award favors one parent, i.e., by awarding one parent primary, or sole, physical custody, the McLendon standard applies to any modification action.
*834 Rehfeld v. Roth, 885 So.2d 791, 794 (Ala. Civ. App. 2004) (citing Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala. Civ. App. 1995) ). Our supreme court has explained:
" 'There are different standards for a trial court to use in ruling on questions of child custody. If one parent has previously been granted primary physical custody or if one parent has "given up" legal custody, then an existing custody arrangement will be modified only if the modification materially promotes the best interests and welfare of the child. Ex parte McLendon, 455 So.2d 863, 865-66 (Ala. 1984). If neither parent has previously been given primary physical custody, then the "best interests of the child" standard applies. Ex parte Couch, 521 So.2d 987, 989 (Ala. 1988).'
" Ex parte Johnson, 673 So.2d 410, 413 (Ala. 1994)."
Whitehead v. Whitehead, 214 So.3d 367, 370 (Ala. Civ. App. 2016).
As we previously discussed, the divorce judgment awarded neither party primary or sole physical custody. Therefore, the best-interests standard of Couch applied to the father's request to modify custody. " '[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.' " Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala. 2005) (quoting Philpot v. State, 843 So.2d 122, 125 (Ala. 2002) ).
The record indicates that, at the time of the hearing, the mother and the fiancé had already obtained a house in Gulf Breeze, Florida. Since the entry of the divorce judgment, the mother had moved to Trussville and Wedowee to live with the fiancé while the children were in school in Clay County. The mother's job was working with the fiancé's business, which, evidence demonstrates, is now based in Florida. Even though in her postjudgment motion to the circuit court the mother asserted that she would not move to Gulf Breeze if she were not permitted to relocate with the children, there was no evidence to that effect presented at the trial.
From the evidence presented, the circuit court could have concluded that the mother had already moved to Florida and that she intended to stay there with the fiancé. We have already determined that, with the mother living in Florida, the custody arrangement set forth in the divorce judgment would be unworkable. The mother did not seek a custody modification; the father did. Therefore, based on the circumstances present in this case, the record before us, and the arguments presented, we cannot say that the circuit court's judgment modifying custody and awarding the father sole physical custody of the children subject to the mother's visitation is unsupported by the evidence or is plainly and palpably wrong. Thus, the judgment of the circuit court is affirmed.
AFFIRMED.
Pittman, Thomas, and Donaldson, JJ., concur.
Moore, J., concurs in the result, without writing.

Section 30-3-150, Ala. Code 1975, states:
"It is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or dissolved their marriage. Joint custody does not necessarily mean equal physical custody."